EFiled: Jan 25 2024 02:30PM EST
Filing ID 71876477
Case Number Multi-Case

## IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| IN RE FOX CORPORATION /SNAP INC. SECTION 242 LITIGATION | § § § § § § § § § § § § § | Nos. 120 &121, 2023 (Consolidated)<br><br>Court Below: Court of Chancery of the State of Delaware<br><br>C.A. Nos. 2022-1007; 2022-1032 |

Submitted: October 18, 2023
Decided: January 17, 2024
Revised: January 25, 2024

Before **SEITZ**, Chief Justice; **VALIHURA**, **TRAYNOR**, **LEGROW**, and **GRIFFITHS**, Justices; constituting the Court *en Banc*.

Upon appeal from the Court of Chancery. **AFFIRMED**.

Gregory V. Varallo, Esquire, Daniel E. Meyer, Esquire, BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP, Wilmington, Delaware; Mark Lebovitch, Esquire, Edward G. Timlin, Esquire (*argued*), BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP, New York, New York *for Appellants Electrical Workers Pension Fund, Local 103, I.B.E.W. and Karen Sbroglio*.

William B. Chandler III, Esquire, Brad D. Sorrels, Esquire (*argued*), Amy L. Simmerman, Esquire, Daniyal M. Iqbal, Esquire, Nora M. Crawford, Esquire, WILSON SONSINI GOODRICH & ROSATI, P.C., Wilmington, Delaware; Mark R. Yohalem, Esquire, WILSON SONSINI GOODRICH & ROSATI, P.C., Los Angeles, California *for Appellee Fox Corporation*.

William M. Lafferty, Esquire, Susan W. Waesco, Esquire, Alexandra M. Cumings, Esquire, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware *for Appellee Snap Inc.*

**SEITZ**, Chief Justice:

Section 242(b)(2) of the Delaware General Corporation Law requires a separate class stockholder vote to amend a corporate charter with a multi-class capital structure if the amendment would "alter or change the powers, preferences, or special rights of the shares of such class so as to affect them adversely." In 2022, Fox Corporation and Snap Inc. adopted officer exculpation charter amendments authorized by recent Delaware legislation. Fox and Snap Class A non-voting common stockholders filed suit in the Court of Chancery and sought to invalidate the amendments. They claimed that a separate class vote was required because the amendments deprived them of the "power" to sue officers for damages for duty of care violations.

The Court of Chancery granted summary judgment to Fox and Snap. The court held that, even though the Class A stockholders had a good plain-meaning argument – a stockholder's "power" included the power to sue – the defendants had linked the "powers" in Section 242(b)(2) to the "powers" in Section 102 of the DGCL, which requires those "powers" to be stated in the charter. The right to sue corporate officers for damages for breach of the duty of care is not a class-based power stated in either charter. Thus, the Fox and Snap exculpatory charter amendments did not require separate Class A stockholder votes.

2

Although the court had reservations about this interpretation, it ultimately held that two decisions controlled the outcome – *Hartford Accident & Indemnity Co. v. W.S. Dickey Clay Mfg. Co.* and *Orban v. Field*.[1]  In these long-standing decisions that interpreted the charter amendment statute in its various forms, our Court and the Court of Chancery held that a separate class stockholder vote was required only when the charter amendment adversely affected a peculiar attribute of the class of stock rather than rights incidental to stock ownership.  Finally, the Court of Chancery noted the lack of treatises or commentary supporting the plaintiffs' position, and long-standing practitioner understanding about how the statute works.

On appeal, the plaintiffs repeat their plain-meaning argument, challenge the precedential value of the two key decisions, and advance parts of the Court of Chancery's analysis that it ultimately decided not to follow.  We affirm the Court of Chancery's judgment.  Based on long-standing precedent, which the Class A Stockholders have not asked us to overrule, the powers, preferences, or special rights of class shares in Section 242(b)(2) refers to the powers, preferences, or special rights authorized for a class by Section 151(a) and expressed in the charter as required by Sections 102(a)(4) and 151(a).  The powers, preferences, or special rights of class shares expressed in the charter include default provisions in the

_____

[1] 24 A.2d 315 (Del. 1942) [hereinafter *Dickey Clay*]; 1993 WL 547187 (Del. Ch. Dec. 30, 1993) [hereinafter *Orban*].

3

DGCL, which are part of every charter under Section 394. The ability to sue directors or officers for duty of care violations is an attribute of the Companies' stock, but not a power, preference, or special right of the Class A common stock under Section 242(b)(2).

I.

A.

The facts are undisputed. In 2019, through a spin-off from its former corporate parent, News Corporation, Fox Corporation became a standalone, publicly traded company. Since the transaction closed, Fox has had a dual-class stock structure. Fox's Class B common stockholders have one vote per share. Fox's Class A common stockholders have no voting rights, except as stated in Fox's certificate of incorporation or when required by the Delaware General Corporation Law ("DGCL").

At Fox's 2022 annual meeting, the board recommended a charter amendment that would exculpate Fox's officers for duty of care damages liability under the newly amended Section 102(b)(7) of the DGCL ("Fox Amendment"). Fox's Class B common stockholders voted to approve the amendment. Fox did not solicit a vote from the Class A common stockholders.

The story was the same for Snap Inc. (f/k/a Snapchat Inc.), which has had a three-class stock structure since its IPO in March 2017. Snap's Class A common

4

stock – which is widely held and publicly available – generally has no power to vote, except as set forth in Snap's certificate of incorporation or when required by Delaware law. Snap's Class B common stock is entitled to one vote per share and is not publicly traded. Snap's Class C common stock has ten votes per share and is not publicly traded.

On August 24, 2022, Snap's board recommended a charter amendment that would exculpate Snap's officers from duty of care damages liability under the newly amended Section 102(b)(7) of the DGCL ("Snap Amendment"). Snap's Class C common stockholders executed written consents adopting the amendment. The Class A stockholders did not vote on the amendment.

B.

In November 2022, a Fox Class A stockholder and a Snap Class A stockholder ("Class A Stockholders") filed separate class action complaints in the Court of Chancery which were eventually consolidated against Fox and Snap (together, the "Companies"). They sought, among other things, a declaration that the charter amendments did not comply with Section 242(b)(2) and were invalid. The parties brought cross-motions for summary judgment, each offering a different interpretation of Section 242(b)(2).

Section 242(b)(2) states, in part, that:

The holders of the outstanding shares of a class shall be entitled to vote as a class upon a proposed amendment, whether or not entitled to vote

5

thereon by the certificate of incorporation, if the amendment would increase or decrease the aggregate number of authorized shares of such class, increase or decrease the par value of the shares of such class, or alter or change the *powers, preferences, or special rights of the shares of such class* so as to affect them adversely.[2]

The Class A Stockholders claimed that Section 242(b)(2) unambiguously required a class vote before adopting the exculpatory charter provisions.[3] As they argued, stockholders have three fundamental "powers" – to vote, sell, and sue. A power, according to Black's Law Dictionary, includes "[t]he ability to act or not act[.]"[4] It follows, they claimed, that "powers" includes the ability to sue officers for damages for duty of care violations.

The Class A Stockholders also relied on a prior version of Section 242 and its predecessor statute, Section 26.[5] The prior iterations of Section 242(b)(2) required a vote if an amendment would adversely affect the "preferences, special rights or powers" of a class of stock. A 1969 amendment to the statute, which brought Section 242(b)(2) to its current form, rearranged the language "preferences, special rights or

---

[2] 8 *Del. C.* § 242(b)(2) (emphasis added).

[3] Pls.' Omnibus Opening Br. in Supp. of Mots. for Summ. J. at 10–19 [hereinafter Pls.' Opening MSJ].

[4] *Id.* at 13 (citing *Power*, Black's Law Dictionary (11th ed. 2019); *Power*, Merriam-Webster (last visited Nov. 29, 2022), https://www.merriam-webster.com/dictionary/power; *Strougo v. Hollander*, 111 A.3d 590, 595 n.21 (Del. Ch. 2015)).

[5] *Id.* at 15; 8 *Del. C.* § 242(d)(2) (1967) ("If any proposed amendment would alter or change the preferences, special rights or powers given to any one or more classes of stock by the certificate of incorporation, so as to affect such class or classes of stock adversely . . . ."); *Del. Rev. C.* § 2058, sec. 26 (1935) ("[T]hat if any such proposed amendment would alter or change the preferences, special rights or powers given to any one or more classes of stock, by the Certificate of Incorporation, so as to affect such class or classes of stock adversely . . . .").

powers" to "powers, preferences, or special rights[.]" The Class A Stockholders argued that this change removed any ambiguity and clarified that "powers" was not cabined to "some unique or 'special' power or right allocated to the class of security at issue."[6]

Even if the court found that "powers" is susceptible to more than one meaning, the Class A Stockholders claimed that "powers" should be read in the context of the DGCL as a whole.[7] They pointed to other code sections that employed the word "powers" associated with the ability to sue and be sued – Section 121(a) (describing expansive powers of the corporation and its officers, directors, and stockholders); Section 122(2) (describing a corporation's power to sue and be sued); Sections 279 and 291 (describing a trustee's or receiver's power to prosecute suits in the corporation's name); and Section 123 (describing the corporation's power to exercise power respecting securities of other corporations and entities).

Finally, the Class A Stockholders claimed that *Dickey Clay* and *Orban* were "inapposite." As they argued, the "*Dickey Clay* Court merely addressed changes to a capital structure, and not the elimination of a personal power (or even a right) appurtenant to ownership of that stock."[8] The same was true, they claimed, for *Orban*. The Class A Stockholders argued that "the fact 'special rights' are not

---

[6] Pls.' Opening MSJ at 15–16.
[7] *Id.* at 17–18.
[8] *Id.* at 22.

7

implicated by the issuance of a new class of preferred stock that necessarily dilutes the percentage of the company's overall voting shares represented by the common stock is not pertinent to whether a stocks' [sic] 'powers' – which, at a minimum, include the ability to vote, to sell, and to sue – are adversely affected by elimination of the right to sue."[9]

The Companies countered that Sections 242(b)(2), 151(a), and 102(a)(4) – with their overlapping use of the terms "powers," "preferences," and "special rights" – must be read together.[10]  They argue that a contextual reading of Section 242(b)(2) reveals that the statute covers class voting on charter amendments adversely affecting only the special characteristics of the class delineated under Section 151(a). Thus, a stockholder's ability to sue officers for damages for breach of the duty of care is not a power, preference, or special right of shares of a class or series within the meaning of Section 151, which are set forth under Section 102(a)(4).

As for dictionary definitions, the Companies contended that isolating a single word in the statute ignores the words surrounding it.  According to the Companies, "powers" is part of a series of words that includes "preferences, or special rights of the shares of such class."[11]  The dictionary definitions of those related words include

_____

[9] *Id.* at 25 (emphasis omitted).
[10] Defs.' Omnibus Opening Br. in Supp. of Mots. for Summ. J. & Answering Br. in Opp. to Pls.' Mots. For Summ. J. at 17–29 [hereinafter Defs.' Opening MSJ].
[11] *Id.* at 23–25.

phrases or terms such as "treating some persons or things more advantageously" and "unusual" or "extraordinary."[12]  In their view, "powers" should be interpreted similarly.  The Companies argued that the Class A Stockholders ignore the modifying phrase "of the shares of such class," which confirmed that it is the peculiar attributes of the class that must be adversely affected, not rights general to all stockholders.[13]

Finally, the Companies contended that *Dickey Clay* and *Orban* "are the seminal precedents" interpreting Section 242(b)(2), consistent with decades of academic and practitioner understanding and usage.[14]  The cases hold that a charter amendment class vote is required only when the proposed amendment adversely affects "the peculiar, unusual, or superior qualities of a particular class."[15]  They argued that the Court in *Dickey Clay* "considered and accounted for all the relevant words when declaring its construction of the statute" and did not limit its holding to the corporation's capital structure.[16]  Both cases "concerned charter amendments that adversely affected common stockholders' power to vote."[17]

---

[12] *Preference*, Black's Law Dictionary (11th ed. 2019); *Special*, Black's Law Dictionary (11th ed. 2019).
[13] Defs.' Opening MSJ at 27–28.
[14] *Id.* at 31–32.
[15] *Id.* at 31.
[16] *Id.* at 33–34.
[17] *Id.* at 34.

C.

The Court of Chancery observed that "there's a lot to be said for the plaintiff's plain-meaning argument[,]" and if it were writing on a blank slate, it would "suggest" that the power to sue for damages was not "readily modifiable" without a separate class vote under Section 242(b)(2).[18]  But after the court wrestled with various hypotheticals as it worked through Section 242(b)(2)'s language and how the statute fit into the DGCL as a whole, the court moved past the plain-meaning argument and concluded that "the officer exculpation amendment does not require a class vote of the company's non-voting stock because the officer exculpation amendment does not affect a power, preference, or special right that appears expressly in the charter."[19]

The court based its ruling on four grounds:  (1) a textual argument that links the powers, preferences, and special rights in Section 242(b)(2) to the powers, preferences, and rights of the class set forth in the charter or certificate of designations under Section 102(a)(4) or stated expressly in the DGCL;[20] (2) *Dickey Clay* and *Orban*, which held that, under Section 242(b)(2) and its predecessor statute, a class vote is only required to enact a charter amendment when it would

---

[18] *Elec. Workers Pension Fund, Local 103, I.B.E.W. v. Fox Corp.*, C.A. No. 2022-1007-JTL at 61, 66 (Del. Ch. Mar. 29, 2023) (TRANSCRIPT) [hereinafter *Decision*].
[19] *Id.* at 69.
[20] *Id.* at 61–63.

impair a "peculiar, or special" characteristic of class shares rather than rights incidental to share ownership;[21] (3) the absence of support for the Class A Stockholders' interpretation from commentators;[22] and that (4) "Delaware practitioners have long viewed *Dickey Clay* as supporting the Companies' reading of Section 242(b)(2)."[23]

The Class A Stockholders raise three issues on appeal – whether the Court of Chancery erred by (1) rejecting the Class A Stockholders' plain-meaning argument that the word "powers" in Section 242(b)(2) includes the ability to sue officers for damages for breaching their duty of care; (2) holding that "fealty" to *Dickey Clay* and *Orban* dictated the outcome; and (3) considering long-standing expectations of commentators and practitioners to support its decision. We review the Court of Chancery's decision *de novo*.[24]

## II.

We start with the statutory framework of the DGCL and the precedential gloss addressing class-based stock voting and charter amendments. In 1899, the General Assembly enacted the DGCL which authorized corporations to issue separate classes

---

[21] *Id.* at 4; *Id.* at 32 (quoting *Dickey Clay*, 24 A.2d at 318–19); *Id.* at 36–37 (quoting *Orban*, 1993 WL 547187, at *8).
[22] *Id.* at 66–67 ("The company has pointed to the absence of any commentary saying anything different over the past decades.").
[23] *Id.*
[24] *See Croda Inc. v. New Castle Cnty.*, 282 A.3d 543, 547 (Del. 2022) ("We review the court's summary judgment ruling *de novo*. We also review questions of statutory interpretation and constitutional law *de novo*.").

11

of stock with different rights.[25] The General Assembly amended the DGCL in 1901 to permit multi-class capital structures through Section 151's predecessor statute, Section 13.[26] In 1917, the General Assembly enacted the first statute requiring a class vote for stock issuances.[27] Section 26, the predecessor statute to Section 242(b)(2), required a class vote for charter amendments:

> if any such proposed amendment would alter or change the preferences given to any one or more classes of preferred stock, authorized by the certificate of incorporation, or would increase or decrease the amount of the authorized stock of such class or classes of preferred stock, or would increase or decrease the par value thereof.[28]

By Section 26's terms, the "preferences" that triggered a class vote referred to those "authorized by the certificate of incorporation." In 1927, the General Assembly amended Section 26 to eliminate the word "preferred," and thereby broadened the scope of the class voting provision. It also included language limiting the right to vote as a class on a proposed amendment only when it "affect[ed] such class or classes of stock adversely."[29] Section 26 was once again amended in 1931 to the form examined in *Dickey Clay*. It required a separate class vote on a charter amendment:

---

[25] Section 137, Chapter 273, Volume 21 Laws of Delaware (enacting the DGCL).
[26] *Id.* (citing Section 13, Chapter 167, Volume 22 Laws of Delaware).
[27] *Hartford Acc. & Indem. Co. v. W. S. Dickey Clay Mfg. Co.*, 21 A.2d 178, 182 (Del. Ch. July 9, 1941) (citing Section 12, Chapter 113, Volume 29 Laws of Delaware).
[28] Section 12, Chapter 113, Volume 29 Laws of Delaware.
[29] Section 10, Chapter 85, Volume 35 Laws of Delaware.

> If any such proposed amendment would alter or change the preferences, special rights or powers given to any one or more classes of stock, by the Certificate of Incorporation, so as to affect such class or classes of stock adversely . . . .[30]

In *Dickey Clay*, the board of directors recommended a charter amendment that increased the amount of authorized class A stock.[31] The common stockholders would not receive dividends until the class A stock was retired.[32] Voting as a class, the class A stockholders approved the amendment – as did a majority of the combined vote of two other classes of preferred and common stock.[33] If counted alone, a majority of the common stock voted against the amendment. A common stockholder filed suit to enjoin the amendment. They argued that, under Section 26, increasing the authorized class A shares adversely affected their rights by diluting their relative voting power, dividends, and assets distributed upon dissolution.[34]

The Court looked to Section 13 and its class-based provisions to discern Section 26's effect on the common stockholders' right to a separate class vote.[35] The

---

[30] Section 8, Chapter 129, Volume 37 Laws of Delaware.

[31] *Dickey Clay*, 24 A.2d at 320.

[32] *Id.* at 317.

[33] *Id.*

[34] *Id.* at 320. The class A stockholders also argued unsuccessfully that the amendment was unfair, violated their due process rights under the Delaware and Federal Constitutions, and violated the Contract Clause of the Federal Constitution. *Id.* at 320–21.

[35] *Id.* at 319 (adopting the Court of Chancery's analysis in *Starring v. Am. Hair & Felt Corp.*, 191 A. 887, 890 (Del. Ch. 1937), *decree aff'd*, 2 A.2d 249 (Del.)) ("The Chancellor, in his effort to discover, if possible, the meaning of 'special' shares, was compelled to refer, and did refer, to the language of Section 13 authorizing the issuance of various kinds or classes of shares. His discussion of the language of this section and his conclusions thereupon are particularly apposite here.").

Court held that the amendment did not adversely affect the "preferences, special rights or powers" of the common stockholders. According to the Court, it is only when the "peculiar, or special quality with which [the class shares]" are endowed is adversely affected that a class vote is required:

> The statute, in listing the amendable rights, or rights and powers, attached to stock, first speaks of preferences. It then speaks of rights, and employs specific descriptive words, followed by the general and embracive words, 'other special.' Whatever may be said with respect to the necessity for the use of the word 'special', as applied to a right attached to stock, in view of the prior descriptive words, it is clear enough that the word was used in the sense of shares having some unusual or superior quality not possessed by another class of shares . . . . [T]he relative position of one class of shares in the scheme of capitalization is not to be confused with rights incident to that class as compared with other classes of shares . . . . The peculiar, or special, quality with which they are endowed, and which serves to distinguish them from shares of another class, remains the same.[36]

In other words, even though the charter amendment adversely affected the relative position of the common stock in the corporation's capital structure, a separate class vote was not required because the amendment did not "alter or change preferences, or special rights or powers, given to a class of shares so as to affect adversely the class."[37]

Over two decades after *Dickey Clay*, Section 26 became Section 242(d)(2) as part of the 1967 amendments to the DGCL, without material language changes.[38]

---

[36] *Id.*
[37] *Id.* at 320.
[38] Section 242(d)(2), Subchapter 8, Chapter 50, Volume 56 Laws of Delaware.

Contemporaneous commentary from two members of the Delaware Corporation Law Revision Committee, Samuel Arsht and Walter Stapleton, suggested that the changes did not deviate from the historical understanding of Section 26.[39] Professor Folk, who had been engaged by the Revision Committee to recommend amendments to the DGCL, explained that "class voting on amendments adversely affecting *class interests* is intended as a safeguard."[40] The Professor recommended expanding Section 242 to provide a separate "series" vote when less than an entire class is affected by a proposed amendment.[41]

In 1969, the General Assembly amended the statute to take on its modern form, now existing in Section 242(b)(2). The 1969 amendment: moved "[i]f any proposed amendment would alter or change[,]" to after "the holders of the stock . . . shall be entitled to vote as a class upon such amendment[;]" changed "preferences, special rights or powers given to any one or more classes of stock by the certificate of incorporation" to "powers, preferences, and special rights of the shares of such class[;]" and added Professor Folk's suggestion to address series voting.[42] Arsht and Stapleton stated once again that no major changes occurred, and explained that

---

[39] *See* S. Samuel Arsht & Walter K. Stapleton, *Analysis of the New Delaware Corporation Law*, 2 P-H Corp. 311, 321 & 337 (1967).

[40] Ernest L. Folk, *Review of the Delaware Corporation Law (1965-1967)*, at 176 (emphasis added) [hereinafter 1967 Folk Report]; Arsht & Stapleton, *supra* note 39, at 337.

[41] 1967 Folk Report at 176–77.

[42] Section 21, Chapter 148, Volume 57 Laws of Delaware.

the 1969 amendment to Section 242(b)(2) "rewords and reorganizes [the] section in an attempt to clarify it" and that the statute would operate just "like the prior one."[43]

In 1993, the Court of Chancery revisited Section 242(b)(2). In *Orban*, the common stockholders argued that they were entitled to a class vote to approve a recapitalization and merger that involved a new class of preferred stock.[44] The new stock issuance diluted the common stock's relative voting power. Chancellor Allen began by noting that "[t]he jurisprudence of class votes in Delaware is not highly developed."[45] Even so, the Chancellor applied this Court's decision in *Dickey Clay* to interpret Section 242:

> The language of [Section 242] makes clear that it affords a right to a class vote when the proposed amendment *adversely affects the peculiar legal characteristics of that class of stock*. The right to vote is not a peculiar or special characteristic of common stock in the capital structure of [the company]. All classes of stock share that characteristic . . . . That this is correct is demonstrated by the important case of [*Dickey Clay*]. There the Delaware Supreme Court held that an amendment increasing the number of authorized preferred shares was not subject to a class vote by common stock. In so concluding the Court held that the stock rights that trigger a statutory right to a class vote are

---

[43] S. Samuel Arsht & Walter K. Stapleton, *Analysis of the 1969 Amendments to the Delaware Corporation Law*, 2 P-H Corp. 347, 353–54 (1969); *see also* Robert S. Saunders, et al., *Folk on the Delaware General Corporation Law* § 242.03 (7th ed. 2023 supp.) (noting that *Dickey Clay's* construction "still appears applicable, and indeed [S]ection 242(b)(2) codifies the result" (citing *Folk*, § 242 (1st ed. 1972)).

[44] 1993 WL 547187.

[45] *Id.* at *8.

rights ("powers, preferences or special rights") not shared with other classes . . . .[46]

In other words, the charter amendment did not adversely affect the common stockholders' ability to cast a vote as provided by the corporate charter and the DGCL. Instead, it changed only the relative or incidental voting power associated with their shares.[47] And, as with *Dickey Clay*, the effect of an amendment on an incidental right did not require a vote because such a right was not a "peculiar, or special quality" with which such shares were permitted under Section 151(a).

## III.

Against this background, we summarize the Companies' textual argument explaining how the current DGCL provisions that address class-based voting work together. Section 102(a)(4) addresses the contents of a certificate of incorporation, which requires that the "powers, preferences and rights" of class-based stock be set forth in the corporate charter:

> The certificate of incorporation shall also set forth a statement of the designations and the *powers, preferences and rights*, and the qualifications, limitations or restrictions thereof, which are permitted by § 151 of this title in respect of any class or classes of stock or any series of any class of stock of the corporation . . . .[48]

---

[46] *Id.* (emphasis in original); *see also Monk v. Imaging Automation, Inc.*, 805 A.2d 902 (Del. Aug. 29, 2002) (ORDER) (recognizing the analysis of Section 242(b)(2)'s applicability was "clearly controlled by this Court's decision in [*Dickey Clay*]. *See also* [*Orban*].").

[47] *Orban*, 1993 WL 547187 at *8 ("According to this argument the issuance of Series C preferred reduced the voting power of the common stock below 10% and this adversely affected the common stock in a foreseeable way . . . .").

[48] 8 *Del. C.* § 102(a)(4) (emphasis added).

17

Section 102(a)(4) references Section 151, which authorizes class-based stock and its attributes:

> Every corporation may issue 1 or more classes of stock . . . and which classes or series may have such *voting powers*, full or limited, or no voting powers, and such *designations, preferences and relative, participating, optional or other special rights*, and qualifications, limitations or restrictions thereof, as shall be stated and expressed in the certificate of incorporation or of any amendment thereto . . . .[49]

Section 242 addresses amendments to the certificate of incorporation. Section 242(a) authorizes charter amendments and Section 242(b)(1) requires that stockholders approve charter amendments by the affirmative vote of a majority of the outstanding stock entitled to vote on the amendment.[50] Typically, non-voting class-based stock would not have a vote on a charter amendment under Section 242(b)(1), unless otherwise required by the DGCL. But Section 242(b)(2) is an exception which requires a separate class vote of non-voting class shares "if the amendment would . . . alter or change the powers, preferences, or special rights of the shares of such class so as to affect them adversely."

The words "powers," "preferences," and "special rights" are unique to these DGCL statutes.[51] Although the "powers, preferences, or special rights" of a class

---

[49] 8 *Del. C.* § 151(a) (emphasis added).

[50] 8 *Del. C.* § 242(b)(1).

[51] "[R]elated statutes must be read together rather than in isolation . . . ." *Richardson v. Bd. of Cosmetology & Barbering of State*, 69 A.3d 353, 357 (Del. 2013) (citing *Watson v. Burgan*, 610 A.2d 1364, 1368 (Del. 1992); *State Farm Mut. Auto. Ins. Co. v. Wagamon*, 541 A.2d 557, 560 (Del. 1988)). This is consistent with the goal to give effect to legislative intent when interpreting a statute. *Id.*; *see Dickey Clay*, 24 A.2d at 319 ("The appellant points out that the Chancellor

18

are not defined in Section 242(b)(2), it was not by accident that the same sequence

of words was used in Sections 151(a) and 102(a)(4). Those sections work together

with Section 242(b)(2) to limit the "powers, preferences, or special rights" of a class

to those authorized by Section 151(a) and expressed in the charter under Sections

151(a) and 102(a)(4).[52] The "powers, preferences, or special rights" expressed in a

charter are those authorized and required to be set forth in the charter by being stated

in the charter or by a default provision in the DGCL, which is part of every charter

under Section 394.[53] The ability to sue directors or officers for duty of care

---

nowhere indicated that Section 26 of the Corporation Law was involved; and, generally, the effect of the decision is waived aside by saying that a different section of the law was under consideration. This is superficial. The [DGCL] must be read and considered in its entirety."); 2A Norman J. Singer, *Sutherland Statutory Construction* § 51:1 (7th ed.); *see also Hudson Farms, Inc. v. McGrellis*, 620 A.2d 215, 218 (Del. 1993) ("[I]t is presumed that the General Assembly is aware of existing law when it acts . . . .").

[52] The Class A Stockholders point out that Section 242(b)(2) does not reference Sections 151(a) and 102(a)(4) and vice versa. Based on this observation, they contend that reading the statutes together produces an "unduly – and incorrectly – cramped" interpretation of "powers." Reply Br. at 13. The reference in Section 102(a)(4) to Section 151 shows that the statutes are related. *Richardson*, 69 A.3d at 357 ("[R]elated statutes must be read together rather than in isolation, particularly when there is an express reference in one statute to another statute." (citing *Watson*, 610 A.2d at 1368)). The lack of a cross reference to Section 242(b)(2) does not create the negative inference that the statutes are unrelated. The common subject matter, and sequence of words in Sections 151, 102, and 242(b)(2) demonstrate that the statutes are related. *Terex Corp. v. S. Track & Pump, Inc.*, 117 A.3d 537, 543 (Del. 2015) ("Statutory construction . . . is a holistic endeavor. A provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme—because the same terminology is used elsewhere in a context that makes its meaning clear . . . ." (citing *United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 371 (1988)).

[53] Answering Br. at 26 ("The Companies argued that 'powers, preferences, or special rights' are class-based rights imbued under Section 151, which are typically stated in the charter or certificate of designations but can include class-based rights incorporated via gap-filler provisions of the DGCL . . . ." (citing App. to Answering Br. at B0158)); 8 *Del. C.* § 394 ("This chapter and all amendments thereof shall be a part of the charter or certificate of incorporation of every corporation except so far as the same are inapplicable and inappropriate to the objects of the corporation."); *See Dickey Clay*, 24 A.2d at 321 ("[T]here is impliedly written into every corporate

violations is an attribute of the Companies' stock, but not a power, preference, or special right of the Class A common stock under Section 242(b)(2).

## A.

On appeal, the Class A Stockholders have abandoned their 1969 amendment argument but still disagree with the Companies' textual approach.  They argue that we should limit our analysis to dictionary definitions of "powers" which are broad enough to include the power to sue officers for damages for duty of care violations. Stated plainly, they contend that we should pluck a single word from the statute, apply a generic dictionary definition to that word, and put on blinders to the rest of the words in the statute and the statute's place in the DGCL.

While dictionary definitions can help discern the meaning of words in a statute, they can also be inconclusive and subject to selection bias.[54]  For example,

charter as a constituent part thereof the pertinent provisions of the State Constitution and statutes. Specifically, [Section 394's predecessor] declares that all amendments to the law shall be a part of the charter of every corporation formed under it except in so far as they are inapplicable or inappropriate to the objects of such corporation.").

[54] *See, e.g.*, *Freeman v. X-Ray Assocs., P.A.*, 3 A.3d 224, 228 (Del. 2010) (refusing to rely on one of three dictionary definitions, and instead applying other principles of statutory interpretation). As the Court of Chancery has stated, while referencing commentary from a distinguished jurist: "a court cannot read words in isolation."  *In re P3 Health Grp. Hldgs., LLC*, 282 A.3d 1054, 1066 (Del. Ch. 2022); Frank H. Easterbrook, *Text, History, and Structure in Statutory Interpretation*, 17 Harv. J.L. & Pub. Pol'y 61, 67 (1994) ("In interesting cases, meaning is not 'plain'; it must be imputed; and the choice among meanings must have a footing more solid than a dictionary—which is a museum of words, an historical catalog rather than a means to decode the work of legislatures."); A. Raymond Randolph, *Dictionaries, Plain Meaning, and Context in Statutory Interpretation*, 17 Harv. J.L. & Pub. Pol'y 71, 73–74 (1994) ("A statute, however, cannot be understood merely by understanding the words in it. Judge Easterbrook thinks dictionaries are like 'word museums.' I think they are also like 'word zoos.' One can observe an animal's features in

the Class A Stockholders rely on one definition of "powers" in Black's Law Dictionary – "[t]he ability to act or not act."[55] At summary judgment, the Companies countered with another dictionary definition – "[d]ominance, control, or influence over another."[56] They also included the complete text of the Class A Stockholder's definition: "The ability to act or not act; esp., *a person's capacity for acting in such a manner as to control someone else's responses*."[57] The dictionary definitions offered by the parties lack context and point in different directions.

The Class A Stockholders' stilted approach to statutory interpretation ignores the context in which the word "powers" is used and how Section 242(b)(2) interacts with other sections of the DGCL employing the same words.[58] As the Companies have argued, "powers" must be read together with "preferences," "special rights," and "shares of such class," and the other DGCL sections addressing class-based powers. The word "powers" in Section 242(b)(2) refers to specific class powers

---

the zoo, but one still cannot be sure how the animal will behave in its native surroundings. The same is true of words in a text.").

[55] Opening Br. at 25–26 (citing *Power*, Black's Law Dictionary (11th ed. 2019); *Power*, Merriam-Webster (last visited Nov. 29, 2022), https://www.merriam-webster.com/dictionary/power; *Strougo v. Hollander*, 111 A.3d 590, 595 n.21 (Del. Ch. 2015)).

[56] Defs.' Opening MSJ at 26 (citing *Power*, Black's Law Dictionary (11th ed. 2019)).

[57] *Id.*

[58] *See Osgood v. State*, 2023 WL 8532754, at *4 (Del. 2023) ("[W]ords in a statute should be given meaning through the context in which they are used."); *Agar v. Judy*, 151 A.3d 456, 473 (Del. Ch. 2017) (stating that words must "'be interpreted in the context of words surrounding them'" (quoting *Zimmerman v. Crothall*, 2012 WL 707238, at *7 (Del. Ch. Mar. 27, 2012))).

under Section 151(a), made express in the corporate charter as required by Section 102, and not to general powers incidental to stock ownership.

The Class A Stockholders also point to other DGCL provisions where "power" is used to describe the authority to file suit. They cite Section 122, which states "[e]very corporation created under this chapter shall have the power to: . . . [s]ue and be sued in all courts . . . ;"[59] Section 279, which grants trustees and receivers of dissolved corporations the "power to prosecute and defend;"[60] and Section 291, which grants receivers of insolvent corporations the "power to prosecute and defend."[61]

Those statutes show that the ability to sue is a power in certain contexts, but none are useful in defining the "powers . . . of the shares of such class." As the Court of Chancery noted in its transcript ruling, Sections 122, 279, and 291 all speak to a different subject matter than stockholder powers.[62] Worse for the Class A Stockholders' argument is that all three statutes explicitly define the ability to sue as a "power" within the context of their own statute, whereas Section 242(b)(2) does not. At most, these statutes show that the ability to sue is a "power" in certain

---

[59] 8 *Del C.* § 122.
[60] 8 *Del C.* § 279.
[61] 8 *Del C.* § 291.
[62] *Decision* at 23.

contexts, but as the Court of Chancery determined correctly, not in the context of the "the shares of such class."[63]

In another argument, the Class A Stockholders claim that the Companies' textual argument results in an "incoherent" interpretation of the DGCL. Their main point is that an "express rights" reading – meaning a separate class vote is required only when corporate action adversely affects a class-based "power" stated in the charter – leads to unequal treatment of identical rights, turning on whether the right is stated in the charter or is a gap-filling power stated in the DGCL.[64]

As the Court of Chancery recognized, however, Section 394 makes the DGCL a part of the certificate of incorporation of every Delaware corporation.[65] Certain powers or rights, if unstated in the charter, are determined by default provisions in the DGCL – for example, Section 212(a) of the DGCL, where a share carries voting

---

[63] The Class A Stockholders also rely on Section 121(a), which states that, "[i]n addition to the powers enumerated in § 122," the "corporation, its officers, directors and stockholders" can exercise the powers granted by the DGCL, the charter, and "powers incidental hereto." They say that the ability to sue for breaches of fiduciary duty to "police corporate misconduct" is a fundamental power of the stock – and that power is subject to Section 242(b)(2)'s voting requirements. But it is not a "power[] . . . of the shares of such class." Rather, it is a power that is – as Section 121 states – "incidental" to the status of being a stockholder, irrespective of the class of stock held.

[64] Opening Br. at 29.

[65] *Decision* at 61–64. *See* 8 *Del. C.* § 394 ("This chapter and all amendments thereof shall be a part of the charter or certificate of incorporation of every corporation except so far as the same are inapplicable and inappropriate to the objects of the corporation."); *STAAR Surgical Co. v. Waggoner*, 588 A.2d 1130, 1136 (Del. 1991) ("[I]t is a basic concept that the General Corporation Law is a part of the certificate of incorporation of every Delaware company."). The court held that whether or not the gap-filler provisions of the DGCL were included in the express rights reading of Section 242(b)(2), the power to sue would still not be one of the "powers, preferences, or special rights of the shares of such class." *Decision* at 62.

power equal to one vote per share.[66]   Class-based powers or rights incorporated through the DGCL's default provisions are also expressed in the charter for purposes of Section 242(b)(2).

Further, under Section 151(g), a board may issue shares of preferred stock in a class or in a series of a class through a certificate of designations.   Once the certificate of designations is filed with the Secretary of State as required by Section 103, it amends and becomes a part of the certificate of incorporation.[67]   The terms of the certificate of designations are also expressed in the charter under Section 102(a)(4).[68]

The Companies' textual argument adheres to how Section 242(b)(2) operates as an exception to Section 242(b)(1).   The Class A Stockholders' rigid interpretation of "powers" upsets the balance between Sections 242(b)(1) and (2).   Section 242(b)(2) is intended as a "safeguard" to protect the powers, preferences and special

---

[66] 8 *Del. C.* § 212(a) ("Unless otherwise provided in the certificate of incorporation and subject to § 213 of this title, each stockholder shall be entitled to 1 vote for each share of capital stock held by such stockholder.").

[67] *Matulich v. Aegis Commc'ns Grp., Inc.*, 942 A.2d 596, 600 (Del. 2008) ("Accordingly, the special rights and limitations of preferred stock are created by the corporate charter or a certificate of designation, which acts as an amendment to a certificate of incorporation."); *Kaiser Aluminum Corp. v. Matheson*, 681 A.2d 392, 394 n.3 (Del. 1996) ("When the Certificate of Designations became effective in February of 1994, it had the effect of amending the Certificate of Incorporation so that the rights of the preferred stockholders fixed by the Certificate became part of the Certificate of Incorporation" (citing 8 *Del. C.* §§ 102(a)(4); 151(g))).

[68] 8 *Del. C.* § 102(a)(4) ("The certificate of incorporation shall also set forth a statement of the designations . . . which are permitted by § 151 of this title . . . ."); 8 *Del. C.* § 151(g).

24

rights authorized by Section 151 and expressed in the charter. It is not a broad grant of the right to vote on any amendment affecting any attribute of stock ownership.[69]

## B.

According to the Class A Stockholders, *Dickey Clay* "merely [held] that the relative position of stock in the capital structure is not a 'power, preference, or special right' under Section 242(b)(2), so an adverse effect on such position does not trigger a class vote."[70] In other words, "adverse changes to the 'relative position' of one class in the capital structure through a charter amendment authorizing the issuance of additional, superior shares does not require a separate vote of the inferior class."[71] They also contend that the Court of Chancery "subordinated its own logic and reasoning" when it found that *Dickey Clay* and *Orban* dictated the outcome.

But a court's ruling is rarely limited to the specific facts before it.[72] *Dickey Clay* held that "[t]he *peculiar, or special, quality* with which [the class shares] are

---

[69] 1967 Folk Report at 176; *Dickey Clay*, 24 A.2d at 322 ("The right of veto by class vote was never conferred on the common shares, and this is not at all surprising in view of their origin. What the appellant would have the Court to do is to reconstruct the contract by giving to the common shares a right never intended to be given.").

[70] Opening Br. at 9.

[71] *Id.* at 34.

[72] One academic paper describes "confining a case to its facts" as a doctrinal workaround to *stare decisis*, where a court can "overrule everything a decision stands for except for its precise result." Daniel B. Rice & Jack Boeglin, *Confining Cases to Their Facts*, 105 VA. L. REV. 865 (2019). And "[o]nce a case has been confined to its facts, the operative question becomes whether a new case is factually distinguishable from it in any respect." *Id.* at 870. Ordinary methods of treating precedent do not call upon courts to engage in "purely fact-bound adjudication." *Id.* We promote "stability in our DGCL." *Stream TV Networks, Inc. v. SeeCubic, Inc.*, 279 A.3d 323, 354 (Del. 2022). Interpreting precedent solely on the facts, rather than the reasoning stated by this Court, undermines the predictability of our corporate law. *Acct. v. Hilton Hotels Corp.*, 780 A.2d 245,

25

endowed, and which serves to distinguish them from shares of another class, remains the same."[73] In *Orban*, the Court of Chancery held that Section 242(b)(2) "makes clear that it affords a right to a class vote when the proposed amendment adversely affects the peculiar legal characteristics of that class of stock."[74] Those cases gave meaning to the phrase "powers, preferences, or special rights" to be applied in future cases.[75] And the "peculiar, or special quality" of which class shares are endowed are the powers, preferences, and special rights which are attributed to and define the class under Section 151.[76]

For three quarters of a century, *Dickey Clay* has stood for two points: 1) that rights incidental to stock ownership are not a peculiar characteristic of the shares of a class of stock, and 2) that Section 242(b)(2) should be read considering other

---

248 (Del. 2001) ("[S]tare decisis finds ready application in Delaware corporate law."); *Speiser v. Baker*, 525 A.2d 1001, 1008 (Del. Ch. Mar. 19, 1987) ("Delaware courts, when called upon to construe the technical and carefully drafted provisions of our statutory corporation law, do so with a sensitivity to the importance of the predictability of that law.").

[73] *Dickey Clay*, 24 A.2d at 318–19 (emphasis added).

[74] 1993 WL 547187, at *8 (emphasis in original).

[75] This Court in *Dickey Clay*, and the Court of Chancery in *Orban*, based their decisions on a prior iteration of Section 242(b)(2). That circumstance does not render the "peculiar, or special" limitation as *dictum*. The rule is not, as the Class A Stockholders would have it, whether some hypothetically narrower holding would result in the same outcome of the case, but rather whether the actual holding had an "effect on the outcome of [the] case." *In re MFW S'holders Litig.*, 67 A.3d 496, 521 (Del. Ch. 2013) (citing *Brown v. United Water Delaware, Inc.*, 3 A.3d 272, 277 (Del. 2010)).

[76] *Dickey Clay*, 24 A.2d at 319 (approving of the use of Section 151's predecessor, Section 13, when searching for the meaning of "special" shares).

provisions of the DGCL. The Court of Chancery faithfully applied *Dickey Clay*, and the Class A Stockholders have not asked us to overrule it.[77]

C.

At summary judgment, the Companies identified nine public multi-class corporations that adopted director exculpation charter amendments shortly after Section 102(b)(7) was enacted.[78] Eight of those corporations did not seek a separate class vote, and the ninth stated that such a vote was not required, though it sought one for the amendment because it was presented to stockholders in a suite of other charter amendments.[79] The Court of Chancery determined that this evidence fit its understanding that "[i]n the nearly 40 years since 1986 and the adoption of Section 102(b)(7) for directors, no one has taken the position until this case that an exculpation amendment requires a class vote."[80]

Although the Class A Stockholders argue otherwise, the Court of Chancery did not make practitioner experience central to its ruling. Instead, it simply observed

---

[77] The Class A Stockholders did not ask the Court of Chancery to assess whether equitable considerations should be part of the analysis. *See Schnell v. Chris-Craft Indus., Inc.*, 285 A.2d 437, 439 (Del. 1971) ("[I]nequitable action does not become permissible simply because it is legally possible.").

[78] Defs.' Opening MSJ at 36–38.

[79] *Id.*

[80] *Decision* at 67–68 ("Speaking for myself, I never previously thought that an exculpation amendment required a class vote.").

that a statutory interpretation which deviated from the historical understanding would conflict with the stability of our corporate law.[81]

## IV.

The judgment of the Court of Chancery is affirmed.

---

[81] *Stream TV Networks, Inc.*, 279 A.3d at 353–54 ("'Our General Assembly has [ ] recognized the need to maintain balance, efficiency, fairness, and predictability in protecting the legitimate interests of all stakeholders, and to ensure that the laws do not impose unnecessary costs on Delaware entities.'" (quoting *Salzberg v. Sciabacucchi*, 227 A.3d 102, 136 (Del. 2020)).

**Multi-Case Filing Detail:** The document above has been filed and/or served into multiple cases, see the details below including the case number and name.

## Transaction Details

**Court:** DE Supreme Court

**Transaction ID:** 71876477

**Submitted Date & Time:** Jan 25 2024 2:30PM

**Document Type:** Opinion

**Document Title:** Opinion decided on 1-17-24 by Seitz, CJ. Revised: 1-25-24. Upon appeal from the Court of Chancery. AFFIRMED. (CJS, KLV, GFT, AML, NCG). (dmd)

## Case Details

| Case Number | Case Name |
| --- | --- |
| 120,2023C | In re Fox Corporation/Snap Inc. Section 242 Litigation |
| 121,2023C | In re Fox Corporation/Snap Inc. Section 242 Litigation |